As a result of family matters, can't be in Chicago today and is participating by video, larger than life, as you see. Our first case for the morning is Luce v. Town of Campbell. Ms. Mersino. Good morning, Your Honors. May it please the Court, Aaron Mersino on behalf of the appellants Gregory Luce and Nicholas Newman. Your Honors, since time immemorial, our public sidewalks have been a natural and proper place for free citizens to exchange information and ideas. For that reason, our public sidewalks occupy a special position in First Amendment analysis. However, the Town of Campbell has barred free speech from the public sidewalks on each of its three overpasses. The Town of Campbell Ordinance 9.12 bans all signs, flags, banners, pennants, streamers, balloons, or truly anything that might even be construed as a sign of any size or shape on all of the public sidewalks on its highway overpasses or even within 100 feet of any of its overpasses. The District Court found that the Town's Ordinance was a valid time, place, and manner restriction, but the Ordinance fails each aspect of that test. Ms. Mersino, good morning.  Haven't a number of other courts approved regulations similar to this one based largely on the obvious danger presented when people overhead are waving signs in front of interstate drivers who are driving at 65 miles per hour and often, unfortunately, more than 65 miles an hour? Absolutely not, Your Honor. What we're looking at is an ordinance that bans all free speech on the public sidewalks. No, no. Aren't you saying that a number of other courts? What I'm asking you is whether a number of other courts have approved regulations similar to this very one. No, Your Honor. The Town is required to establish that this ordinance is narrowly tailored to each of the three overpasses in its town. So no other courts have approved such regulations?  Is that what you're saying? Yes, where it bans all free speech on the public sidewalk, on the overpass, and even within 100 feet. And how about our own decision, our own second Ovidal decision? I notice your brief mentions the first Ovidal decision, but not the second, which appears to approve an ordinance pretty much like this one. Your Honor, this is a fact-specific inquiry, and here, Ovidal is different from this ordinance in many respects. So that's the same as your answer to Judge Rovner. You just contend that all other cases, despite the fact that the plaintiff has lost all similar cases, they're just all irrelevant. No, this plaintiff, this is their first case. The Town of Campbell, this is the first case challenging the ordinance. Look, we generally operate in the United States through a system of precedent. Your contention is that all precedents in which the plaintiffs have lost are irrelevant, and all the cases in which the plaintiffs have won support you. This seems, well, strange. Your Honor, I think that that's misconstruing what I'm trying to say here. What I'm trying to say is that the First Amendment jurisprudence requires that the Town of Campbell establish that this ordinance is narrowly tailored. And here, it simply is not narrowly tailored. How is the record in this case any different from the record in the second Ovidal case? Well, let's look at the ordinance itself. No, I'm asking a question about the Ovidal case. Yes, Your Honor. How is the record different from the record in the Ovidal case? Because when you look at the ordinance, and you look at the reasoning of the Town, and you look at whether or not this ordinance is narrowly tailored to the facts at issue in this case, it simply is not. So, we can't compare apples and oranges. We can't compare. Tell me something that was in the record in the second Ovidal case and is missing from the record here. Well, when you're looking at simply traffic patterns in the City of Madison, and you're looking at the reaction and the facts that actually occurred in the Ovidal case, and you look at the facts here, they're very different. It's comparing apples and oranges. And the Constitution requires that the defendant's restriction be narrowly tailored. And here, when you look at all of the different facts that are in the record in this case, it simply is not. It does not meet constitutional scrutiny. Well, actually, Counsel, the ordinance in Madison that was adopted during the litigation in the Ovidal case was not tested in the Ovidal case. It was not before the Court. That's true, Your Honor. That's very true. Is that a material distinction that might be responsive to Judge Easterbrook's question? That is a material distinction, and that's very true. It has not been expressly decided by this Court at all. So, there is no case actually approving any ordinance of this sort on a developed record or otherwise for that reason because the ordinance was not tested. It just mooted the claim for declaratory and injunctive relief in Ovidal. That is absolutely correct. So, all that was before the Court in the second round of the Ovidal case was the prior unwritten policy. That is absolutely correct. Now, of course, Ovidal, let me quote from Ovidal and see how this factors in. Quote, if the city had a policy that prohibited not just Ovidal's, but all protests and all signs on all Beltline overpasses, this could certainly be a legitimate place in manner restriction because it would be clearly content neutral. How do you deal with that? Well, here, whether or not the ordinance is content neutral, it still must be narrowly tailored. And we look at the facts of the case when we look at the record here. And when we look at the facts of the case in the record here, the ordinance applies 24 hours a day, seven days a week. When you look at where the free speech is banned, we're looking at public sidewalks, which the Supreme Court just two terms ago reaffirmed that public sidewalks remain amongst one of the most valuable venues for the exchange of ideas because it's one of the few places where it's. Okay, maybe we could focus. This isn't really a case about content neutrality. That was what Ovidal was about. This case is about the fit and the application of the rest of the test for time, place, and manner restrictions. In other words, narrow tailoring, the fit between the government's means and its end. In other words, the public safety justification that's been asserted here, as well as the alternatives for this speech that are left open. Those are the pressure points of this case. So maybe we could get to those. Sure. I think that the Weinberg case is particularly instructive. Here, like in Weinberg, the record focused on two self-serving witnesses and their testimony that was rather scant, which is the same as what we're looking at here. When we're looking at the very scant testimony of Defendant Kellerman and Scott Johnson, who voted in the ordinance. Similar to Weinberg, the defendants have offered no empirical studies, no police reports that showed that the demonstrations actually caused any sort of public safety risk, no reported injuries, nor evidence of any lawsuits caused by any sort of injuries caused by the town. Well, municipalities don't have to wait until somebody's injured, right? You don't have to wait until injury, but you must have facts that establish that. Well, but the Supreme Court has indicated that First Amendment restrictions can be based on a wide variety of evidence, including anecdotal evidence and common sense. Given that, why couldn't this town rely on the evidence that drivers were reporting safety problems to the police, and that the layout of the area with those merging lanes rendered any further distractions more dangerous? You know, the lanes are merging, people are coming off, people are coming on. The key word here is evidence, and the defendants simply have not supplied evidence to that effect. They supplied a hearsay statement in the chief's affidavit, but it really did not establish that there was any sort of public safety risk. When you look at the actual evidence in the case, what you have are conclusions by the defendants and no real evidence, and that's why we're looking at that there is no empirical studies, no real evidence that has been presented, certainly not evidence that would rise to a finding that defendants have established and met their burden that this ordinance is narrowly tailored. A highway is not a sterile vacuum. There are signs everywhere. I mean, certainly last term the Supreme Court was looking at Walker versus Texas Division Sons of Confederate Veterans, where they were looking at purposeful speech in the form of vanity license plates for drivers and passengers to look at and receive. The plaintiff, both plaintiffs in this case, submitted the testimony of an expert who went through the conclusions that were provided by the defendants and found that they were simply false. He studied the area. He studied I-90 and found that this is an area that is actually lightly traveled. That's on the additional appendix, page 202. There's only four lanes in this lightly traveled area of I-90. Now, of course, that report was not even before the town when it provided the regulation, was it? No reports were because they did no studies. They did no analysis. No, there were reports by people. Drivers were frightened. There's no evidence that any drivers were frightened. The only mentioning of anything by the defendants is that there was honking, which, pursuant to state law, all drivers in Wisconsin must have a horn in their car. Certainly honking is not something that's considered dangerous. It's considered a safety precaution. And then there's hearsay evidence that people were scared. Well, honking can certainly be considered dangerous. Pardon? Honking can certainly be considered dangerous. Well, honking is considered a warning, and that's why it's required to be in all of the vehicles in the state of Wisconsin. Well, the honking at issue here has nothing to do with warnings. It has to do with responding to the honk if you want Obama impeached signs. Even so, the plaintiffs would not be ‑‑ their speech would not be able to be silenced based on the reaction of a listener. That's, of course ‑‑ What I'm trying to figure out is if you are ‑‑ are you denying that the town had evidence from drivers themselves who contacted the police department and from law enforcement who monitored traffic in the area, both local and Wisconsin state police? Are you denying that? Those are hearsay statements. The defendants have not provided any sort of statements from any witnesses saying that, other than defendant Kellerman, whose judgment is certainly questionable considering the facts in this case. And also, people tend to slow down when they see a police vehicle in the roadway. Also, there was construction in that area of I‑90 at the time. So there simply is not ‑‑ So the garbage truck driver, that's ‑‑ it just is no evidence at all that he offered. He offered no evidence that there actually was any sort of safety risk. He offered conclusions. That's the town chairman, right? Correct, Your Honor. And he's not a witness to any of these protests. No, Your Honor. Right. Kellerman is the chief. But his credibility is in question based on his retaliatory activity against your clients and his criminal prosecution for that. And we have no call logs. We have no really independent, objective evidence that any complaints were made, right? All we have is his testimony. Yes. Or proffered testimony in the form of an affidavit. Was his deposition taken? It was taken, Your Honor. Okay. What did he say in deposition about these calls? Was ‑‑ He testified essentially the same as ‑‑ Do you have specifics? Yes, Your Honor. So essentially the testimony was that he saw braking, but nothing that would arise to any sort of public safety issue. What about the complaints that he says were made? These are hearsay statements. They're unverified complaints and defendants have not provided any other evidence that speaks to anyone who saw something that was dangerous. What did he say was the source of his knowledge of those complaints? Did he take the calls? Did the department in general take the calls? What do we know about that? He did not say. We don't know anything about that. Yes, Your Honor. So it's just his representation. Correct. They're unverified complaints. When an actual expert in this field, Dr. Dorothy, analyzed the affidavit and statements of Kellerman, he said that Defendant Kellerman simply overstates his case, that there is any sort of public safety issue here, and that's on the additional appendix, page 208. And he analyzed, would any sort of signs on the overpass pose any sort of danger by diverting attention from the driver? And he simply said that, no, viewing the activity on the overpass does not require a driver to divert attention to a point where vital roadway information would be compromised. Again, the highway is an area where we receive information from signs all of the time. The state of Wisconsin itself agrees. They have a sign carved into the town of Campbell Lakeshore Drive overpass, and that's a sign that is approved by the state itself. Additionally, on the additional appendix, page 209 and 10, Dr. Dorothy analyzed another sign that was approved on the overpass by the state of Wisconsin for the Elroy-Sparta overpass. So certainly if this is so dangerous, then the state of Wisconsin itself would not condone such signs on the overpasses. So it's your view that signs that are on every expressway, on almost every overpass that direct you to a town, et cetera, are the same as individuals waving signs, homemade signs, and that both would equally distract drivers? That is your view? Well, actually, Dr. Dorothy said that some billboards cause a greater distraction for drivers because the driver actually has to look off to the side of the roadway, and his visibility may actually be diverted in that case. And looking at the ordinance, it also has a 100-foot rule, and so it bans speech not only on the public sideway of the overpass but also within 100 feet, and defendants have offered simply no reason at all for the ban of speech. I'm concerned, counsel, about what interest your clients have in that. It seemed to me your strongest argument was the observation that there are two homes within 100 feet and that they couldn't put signs on their front lawn. But so far as I can see, your clients don't own either of those homes, do they? Your Honor, they do have standing to challenge the overpass. Could you answer my question, and then you can tell me why you think the answer isn't controlling. Do they own either of those two homes? The appellants do not own either of those two homes. Do they have permission from the homeowners to use their lawns for the posting of signs? They do not have permission. Okay, so now I understand the facts, and now you can tell me why you think that answer doesn't matter. Okay, thank you, Your Honor. So obviously both of the appellants here have been cited for violations of the ordinance. The ordinance applies to them, it applies to the public sidewalk, and it applies to their demonstrations both on the overpasses and within 100 feet on the public space. So while they would not be actually protesting on that lawn, certainly that argument goes to show that this is not legally tailored. Have your clients, say, filed an affidavit saying, but for this ordinance, I would put up a sign in the following location, say 50 feet off the overpass? Yes. Well, Appellant Luce wanted to hold a demonstration that was off of the overpass, and he filed an affidavit in this regard in the lower court, and it's part of the court's record, that he wanted to hold a demonstration for 40 days for life, and it was off the overpass but within 100 feet, and there's public land in that area. Okay, good, thank you. The district court, in their opinion, said that it was bothersome that the defendants could not articulate a basis for their 100-foot restriction. That's in the short appendix 23. Well, it's more than bothersome, it's unconstitutional. Scott Johnson, who testified on behalf of the city as the 30B6 witness, testified that there was no reason for selecting the 100-foot provision. Well, that certainly negates any sort of reasoning that this was narrowly tailored. And in addition, Your Honor, as you were mentioning, this covers private residences who now may not post signs, they cannot wave an American flag on their property. Right, but we don't have third parties standing here. They haven't complained. Yes, Your Honor. But this does go to show that there was no analysis to determine whether or not this was actually narrowly tailored to the situation at hand. And Dr. Dorothy said, he testified, and in this instance, there was no defense, no analysis, and no justification presented for the 100-foot rule. Well, this certainly does not meet constitutional scrutiny. When looking at the manner of what the ordinance bans, it bans any sign, any size. It bans T-shirts that together can be construed as a sign. It bans American flags, even a balloon. Your Honor, I see that my time is up. Thank you very much, Counsel. Thank you. Mr. Lesner. May it please the Court, my name is Justin Lesner, and I represent the Town of Campbell with respect to the First Amendment claims asserted against the Town. The Overpass Sign Ordinance was enacted by the Town of Campbell to address legitimate and well-founded traffic safety concerns. There should be no dispute that the law is content neutral. It treats all types of speech the same, regardless of its content or speaker. Therefore, the ordinance is subject to intermediate scrutiny. We believe that the District of Cleveland- Was the evidence that drivers had pulled over on the interstate in response to the protests before the Town Board when it approved the regulation, or was that evidence that's been presented for the first time in this litigation? Those photographs that are part of the record were not before the Town at the time the ordinance was enacted. There is case law that supports that the record supporting the ordinance can be built through in the litigation process. That case is DEMA Corporation versus the Town of Haley. That corroborates the Town's traffic safety concerns. Counsel for appellants argued that there's really no evidence, no basis to enact this ordinance. We obviously disagree with that for a number of reasons. Scott Johnson, the Town Board Chairman, did observe traffic safety problems and at the September board meeting told- He was a witness to these demonstrations? Yes. And he addressed the Town at the September 10, 2013 board meeting and said this is a safety issue. His experience in driving the roadway- What did he observe at the demonstrations that caused a traffic concern? Traffic slowing. He received calls also from constituents complaining about traffic safety problems, noise, disturbances at the overpass. Do we have any specifics? From Scott Johnson? Well, let's start with him and then we'll get to Kellman. Okay. What specifics did he offer? Scott Johnson offered his common experience in driving this roadway. Okay. That's worth, like, zero here, okay? What specifics did he offer about traffic hazards created by these demonstrations? Traffic slowing and braking. A lot of that came from Chief Kellman. Oh, so it was secondhand from Kellman? Most of it was. What did he observe? I believe there was traffic safety problems. You believe. Tell me what you know. What does the record say he observed that he could swear to at an evidentiary hearing in court that he observed? Most of that was from Kellman. I don't know. So we don't even know if he was a witness? Correct. Okay. So you take back what you just said two minutes ago that he was a witness? Correct. Okay, so he's not a witness to any of these demonstrations. He can't testify to anything of any value in the First Amendment analysis here. So it all rests on Kellman. Kellman complains from others in the town to Kellman. And what specifics do we have about that? Do we have call logs? Were these calls made to the police department such that there would be a record of them? We do not have call logs. It was to the non-emergency number of the police station. And what records are made of complaints of this sort on an ordinary basis by the police department? There are none. So we have no objective evidence that any of these calls were made other than what Kellman says? Correct. And he's got credibility problems here. There's a five-month gap between when the first protests happened in August and when this alleged retaliatory conduct started. Between August and January is that gap. January is the first time. Right. But he made no record of calls of complaints. The police department itself made no records of the calls of the supposed complaints that were received. Correct. How does he know that these calls were made? How does who know that these calls were made? The chief, Kellman. Chief, he has firsthand personal knowledge of receipts. He took the calls? Correct. That's what he testified to in his deposition? Officer Casper is another person in the police department. Okay. Do we have deposition testimony from him that he took complaint calls? I don't believe he actually took those complaint calls, but he talked to Kellman shortly after those calls. So his knowledge comes from Kellman, too? Correct. Okay. And that's not worth anything. What we need to know is what the basis of Kellman's knowledge is. Either he took the calls himself, or there's some record, some police department record, from which he's offering his testimony. He took the calls himself. That's what he said? Correct. Okay. And he made no record of those calls? There's no record of those calls. He, after receiving those calls, spoke with Chairman Johnson and had a discussion of, what can we do to alleviate these traffic safety concerns? And that's when the Department of Transportation studies were looked at. Okay. Other evidence of municipalities enacting similar practices. San Diego. Well, San Diego, Southern California, similar protests, Your Honor. You're really going to stand up here with a straight face and say the experience in San Diego is comparable to the town of Campbell, Wisconsin? There's obviously more cars on the roadway in San Diego. By an order of, what, three times as many, four times as many? But it was similar protests, temporary signs being hung. I'm talking about the traffic. This is a lightly traveled stretch of the interstate in a small town in Wisconsin. This is not San Diego. Well, it's close to downtown La Crosse. It's one of the larger cities in Wisconsin. Ex-urban La Crosse. It's a lightly traveled segment. Town of Campbell. It's a lightly traveled segment compared to other roadways on Interstate 90. But there's 20,000 to 30,000 cars that travel below this overpass on a daily basis. I think that's a significant amount. 23,000, I think. 23,000. Right. Up to 30, I believe, based on some other studies. Nope. The last 10-year average is 23,000, according to the objective evidence in the record. Right, which puts it as lightly traveled. Compared to other portions of Interstate 90, such as close to Madison, yes. Right, and it's rated LOS-A, which is the most lightly traveled rating. That is correct. Regardless, if you look at the video of these protests, it's evident that this is causing traffic safety. The video shows people honking their horns. You can hear the horns honking. It doesn't show traffic hazards. I believe honking a horn can cause distraction on the roadway, especially the layout of this highway where you have emerging traffic from your left or right. You could have a semi-truck trying to merge onto the expressway, and directly above you are various signs and displays being exhibited from an overpass. I think the physical layout of the highway is a strong factor and basis for enacting this ordinance. This isn't some open stretch of highway near Sparta, Wisconsin, where there's another overpass where there's no lanes of emerging traffic. These are lanes for traffic merging into and exiting from the interstate. Isn't that correct? That is correct, Your Honor. You're literally the lane, if you're going westbound, the lane for traffic merging onto I-90 is directly to your right, below the overpass. So the physical layout of the highway, we believe, justifies the enactment of the ordinance. And just so I have it right, Kellerman testified that he observed traffic slowing and braking in response to the protests and observed drivers pulling their vehicles to the side of the road to take photographs of all of this. Excuse me. Kellerman did observe cars slowing and braking. He received one call from a gentleman who said he was nearly rear-ended near an overpass protest. Scott Johnson, who has no alleged retaliation or bias in this case, received calls of traffic safety issues caused by this protest. And is it so that drivers were complaining of the need to slam on their brakes near or at the overpass in response to other drivers that were doing so during the protests? Correct. And these were received in August, Your Honor, August 2013. There was no retaliation until January of 2014, when Kellerman and the police department were inundated with e-mails, death threats, other serious things. That's when the retaliation started. So there's a five-month gap. And a lot of the talk is about motive. If an ordinance or law is otherwise constitutional, the motive is irrelevant. That's from the DEMA Corporation v. Town of Haley case. We believe the record here supports an enactment of the ordinance based on traffic safety concerns. The evidence that came in after corroborates that, the photographs of vehicles pulling over. Others on the town board voted to enact the ordinance. It was a four-to-one vote. Obviously, Chief Kellerman is not on the board. So the information provided to the board, the research they did, consultation with their council, they decided to enact this ordinance. Well, what research are you referring to? Research of other municipalities, such as Madison, who have an overpass sign ordinance. The DOT study, Kellerman speaking with state patrol officers. The board itself did this research? I don't believe the board itself, but the information was reported to the board. And they made a recent decision with their council to enact this ordinance and to tailor it. Right, but we're at the evidentiary phase now. And the law requires an evidentiary showing to justify the ordinance. And the evidence, it seems to me, is limited to Kellerman's testimony about these complaint phone calls and his testimony about the general traffic patterns and traffic hazards on this stretch of the interstate, which has been severely called into question by the plaintiff's expert. So isn't there enough here for a trial to resolve whether this is actually a dangerous stretch of interstate so that the traffic hazard concerns of the municipality are real as opposed to pretextual for speech suppression? Your Honor, I don't believe it requires some type of extra report, as plaintiffs suggest. No, an evidentiary hearing to test the anecdotal foundation of your ordinance. And it seems to me it's purely anecdotal. I believe it's common sense that if you're going to be displaying signs. Even that requires some evidentiary testing. We have evidentiary testimony. When Officer Casper was deposed, although he may have not observed all the protests or the protests, he believed that would be traffic safety. Did he observe any of the protests? I don't believe so. Okay. So how can his testimony add anything? Photographs of the overpass protests and cars pulling over on the side of the road. I think anyone can agree that a vehicle pulling over on the side of the interstate to observe protests is a traffic safety issue. And how often did that happen? On at least two occasions. Officer Casper observed one protest in December after the ordinance was enacted and pulled over a woman or stopped a woman who was already pulled over on the side of the road and created a report and asked her what she was doing, and she said she was observing the protests. There's photographs from plaintiff's own witnesses, and they admitted in their depositions, yeah, we saw cars pull over on the side of the roadway. So that, I think, is the biggest fact. If you have people pulling over to take photographs of a sign, I believe that's a traffic safety issue. The council's questions are an argument about the DOT etching the overpass. We believe that's fundamentally different. Those are permanent etchings. They kind of blend into the stonework. We do not believe that is similar. It causes as much distraction as a temporary sign. Those etchings also do not call into question or dispute the actual observations the town of Tampa made. The alternative channels of communication, plaintiff's argument failed that test. I think that's incorrect. Do not have to give the plaintiffs or the speakers the same audience or same level of audience. Well, the McCullen case calls that assertion into question, doesn't it? I don't believe so. If the ordinance severely restricts the plaintiffs from reaching their intended audience. The numbers aren't the analysis, whether they are going to reach the same amount of people.  There's miles of roadway within town of Campbell that is open for them to express their views. Right, but the focus of the analysis in the McCullen case was whether the sidewalk counselors in Massachusetts could reach their intended audience for their speech, even with the buffer zone in place. And the court held that they could not and that it was therefore not narrowly tailored and did not pass intermediate scrutiny. Your Honor, I believe that case they were specifically targeting abortion clinics or health care clinics. Here, there's nothing unique. The patients, right. There's nothing unique about people driving on the highway. That's not a specific category of the population. I believe my time is up. You've got about 30 seconds. Okay. There's nothing unique about cars traveling on the roadway in terms of reaching that audience for the alternative channels of communication factor. We believe the district court correctly found the ordinance is a reasonable time, place, and manner restriction on speech. Thank you. Thank you very much. The case will be taken under advisement. Our next case for argument this morning is Jones v. Callaway.